NELLIE J. COMPTON, Administratrix, Appellee, v. J. B. HITES et al., Appellants.

**DEEDS:** Title to Center of Stream. A deed which conveys all that
1 part of a named section which *"lies east"* of a specified non-navigable river, carries title to the *center line* of the stream.

**EVIDENCE:** Representations of a Deceased. Evidence of alleged
2 representations of a deceased person, especially when contradiction is impossible, should be carefully scrutinized and cautiously weighed.

**COVENANTS:** Incumbrances Deducted from Purchase Price. In an
3 action for damages for breach of a covenant against incumbrance, the fact that the incumbrance in question was deducted from the purchase price, constitutes a complete defense.

*Appeal from Butler District Court.*—M. F. EDWARDS, Judge.

NOVEMBER 22, 1918.

SUIT in equity to foreclose a purchase money mortgage. The main defense was a counterclaim for alleged shortage of acreage in the land purchased by the defendant. There was also a counterclaim for breach of warranty against incumbrances, and for failure to furnish an abstract of title. There was a decree for the plaintiff, and the defendant appeals.—*Affirmed.*

*J. G. Mitchell* and *Sager & Sweet,* for appellants.

*McCook & Lyons,* for appellee.

EVANS, J.—The foreclosure petition is formal. The answer is voluminous, and is set forth in nine counts. The seller of the farm was Whitefield Compton, now deceased. The purchaser was the defendant J. B.

1. DEEDS: title to center of stream.

Hites. The purchased farm was described in the contract of sale as follows:

"All of that part of the Southwest Quarter of Section Number Seven (7) in Township Number Ninety-three (93) North, Range Number Sixteen (16) West of the 5th P. M., *lying east of the Shell Rock River,* except the right of way of the Chicago, Rock Island and Pacific Railroad."

The same description was later followed in the deed of conveyance. The consideration agreed on in the' contract, and specified, was $19,367.50. The amount of the consideration was arrived at by computation based upon the agreed price of $152.50 per acre, and a supposed acreage of the farm of 127 acres. It is agreed that the Shell Rock River extends from north to south, across the northwest quarter of Section 7. Whether the farm sold to Hites contained 127 acres depends upon the question of whether its dimensions shall be considered as extending to the center line of the Shell Rock River, or whether they shall be deemed as extending only to the shore line. If Hites, by his contract and deed, acquired title only to the shore line, then he received an acreage of only 120.72 acres, leaving a deficiency of 6.28 acres. On the other hand, if, by his contract and deed, he acquired title to the center line of the stream, he received the 127 acres contracted for. His counterclaim is based upon the general theory that his contract contemplated a purchase of a tract of land which should contain not less than 127 acres outside the river bed. To support such contention, he relies upon alleged verbal representations to that effect. His claim in this respect is set forth in various theories by the separate Counts II, III, IV, V, and VI.

By Count II, he sets forth an alleged verbal agreement, the material part of which is Paragraph 4, as follows:

"That the parties to said contract did further verbally agree that the said tract of land described in said written contract, Exhibit 1, contained one hundred twenty-seven (127) acres or more."

By Count III, he sets forth an alleged mutual mistake, by which the consideration named in the contract was mistakenly stated. Paragraph 3 of this count is as follows:

"That, by reason of the mutual mistake of the parties to said written contract, the said calculation was made upon the supposition that the said tract of real estate contained one hundred twenty-seven acres or more, whereas, in truth and in fact, the said tract of land contained and does contain one hundred twenty and 72/100 (120.72) acres, and no more."

By Count IV, he asks a reformation of the contract, by reason of the mutual mistake.

By Count V, he sets forth a verbal warranty that the tract of land purchased contained 127 acres, of which the following Paragraph 2 is the material part:

"That the said Whitefield Compton and Nellie Compton did verbally warrant unto the defendant, the said J. B. Hites, that the said tract of land contained one hundred and twenty-seven (127) acres or more."

By Count VI, he avers that the vendor falsely and fraudulently represented that the tract contained 127 acres, the following Paragraph 3 being the material part of said count:

"That, immediately prior to and at the time of the execution of the said written contract, the said Whitefield Compton did verbally state and represent unto these defendants that the said tract of real estate contained one hundred twenty-seven (127) acres or more."

I. From what has already been said, it is clear that the defendant purchased riparian land upon a non-navigable stream, and by his purchase became a riparian owner, with full riparian rights. In legal effect, the contract and deed, by the description contained therein, purported to convey to the thread, or center line, of the stream. *Moffett v. Brewer*, 1 G. Greene 348; *City of Dubuque v. Maloney*, 9

Iowa 450; *Foster v. Bussey,* 132 Iowa 640; *Kerr v. Fee,* 179 Iowa 1097. On this general proposition, the authorities are uniform. This ultimate fact involves no dispute of fact between the parties, the only dispute being one of law, as to the legal effect of the description. On the legal contention, we find with the plaintiff. If, therefore, the tract purchased by the defendant contained 127 acres, this fact, of itself, carries down every count in his counterclaim; and this is so even as to the count charging false and fraudulent representations. The only false representation charged is "that the said tract of real estate contains one hundred and twenty-seven acres or more."

II. We do not overlook that, upon the trial of the case, the defendant introduced evidence of representations other than those pleaded, and that his argument is founded largely upon such evidence. Without raising any question of variance between pleading and proof, we proceed briefly to a consideration of the evidence. The evidence of five witnesses was introduced by the defendant. These witnesses consisted of himself, his wife, his daughter, his young son, and Brandenberg. All these witnesses testified to the same alleged conversation. Brandenberg testified as follows:

2. EVIDENCE: representations of a deceased.

"Mr. Compton said that there was 127 acres in the farm, without the railroad. He showed us as near as he could from where we were standing, pointed out the corner at the east, and then said it went down to the river. At the time this conversation was taking place, we were all kind of together there, right beside the automobile where we had stopped when we came there. This Mr. Compton of whom I speak is now dead."

"Cross-examination.

"Q. He said that there was 127 acres included in the piece he owned, did he? A. Yes, sir, that's what he said. That is right. I am sure that is just what he said,—that

there was 127 acres in the land that he owned there. He said that he had title to 127 acres of land there, and that was what he was offering for sale. He said that. That is correct, that he had title to 127 acres of land there, and that was what he was offering to sell there. That is right,—yes, sir, without the railroad. He said that the railroad was to come out of that, but he said that, except for what the railroad took for right of way across his place, he had title to 127 acres there, and that was what he was offering to sell there."

Hites himself testified as follows:

"There was something said in reference to the acreage in that farm. He said that there was 127 acres on this side of the river, on the east side of the river, and that it excepted the railroad. Mr. Compton said it, and so did Mr. Soesbe, I think. I think they both said it. It was said by Mr. Soesbe in Mr. Compton's presence and hearing."

"Cross-examination.

"I say that there was some statement made to me by Mr. Compton as to the acreage in that tract. He said that there was 127 acres east of the river. That is just what he said about it."

It will be noted from the foregoing testimony of these two witnesses that they were in line with the allegations of the counterclaim, and disclosed no representation that can be found false upon this record. The plaintiff's daughter, however, testified as follows:

"He said that there was 127 acres *without the river*, and that the land just went to the river, and that there wasn't any river belonging to that place; that not a foot of the river belonged to that place. Mr. Compton said that."

The son, Henry, testified:

"Well, Mr. Soesbe turned and asked Mr. Compton the number of acres that was in there, and Mr. Compton said that there was 127 acres, or if anything, more; and Mr.

Compton then turned around, after he said that to my father, and said to Mr. Soesbe, 'Ain't it, Clarence?' Q. What else was said at that time, if anything, that remember of hearing? (Mr. McCook: Same objection.) A. Well, Mr. Compton said that there was 127 acres without the river and the railroad."

Defendant's wife testified:

"Why, Mr. Hites asked Mr. Compton how much there was in the place, and he said that there was 127 acres, or more, without the railroad and the river, and he turned around to Mr. Soesbe, and said, "Ain't there, Mr. Soesbe?""

It will be noted that the testimony of the last three named witnesses marks an advance upon the pleadings and upon the testimony of the defendant himself. Appellants' argument is founded largely upon this latter testimony. Evidence of alleged representations by a person since deceased, is not to be too blindly received. Indeed, it is the duty of the court at all times to scrutinize it and to weigh it carefully. Even though it be undenied, as it usually is, the court is not bound to believe it, if, upon the whole record, the court can fairly say that it is not convinced of its truth. The testimony of these last-named witnesses pertained to the same conversation as that testified to by the defendant Hites and by Brandenberg. If the additional statement testified to by these witnesses was made by Compton, it is manifest that it was not heard or understood by Hites or Brandenberg. Hites was the only one to be affected by the statement, and if he failed to hear or understand it, he was not affected by it. That this evidence carries the mark of afterthought, and the emphasis stimulated by pending litigation, is indicated by the fact that the representation thus stated was not pleaded.

The adverse finding of the district court indicates that the trial judge was not convinced of the truth of the additional statement appearing in the testimony of these wit-

nesses. We are not convinced of it. We have no doubt that the conversation was fairly stated by the defendant Hites and by Brandenberg, and we are disposed to regard the mistake of the other witnesses with much charity, because of their affectionate relations to the defendant and their undoubted solicitude for his success. Memory itself sometimes deceives a witness, under such circumstances. If the fact were to be found as testified to by these witnesses, still other obstacles appear in the way of the defendant's success. Taking such evidence as true, the defendant would be in the position of having acquired title to 127 acres, but of having been deceived by verbal representations that he was getting 127 acres outside of the river bed. In such a case, the measure of his damages would be the difference in the value of a tract so described and the value of the tract actually acquired by him. He has introduced no evidence of difference of value. He has simply assumed that he is entitled to an offset, amounting to the value of 6.28 acres at $152.50 per acre. Such a computation ignores the value of the riparian right, including the ownership of the bed of the stream to its thread line. In other words, it assumes that such riparian right has no value. This is a material mistake. Riparian rights are presumptively valuable. They have the frequent protection of the courts. They are often, if not usually, deemed more valuable than corresponding areas separated from the stream. If, in this case, the defendant had discovered that his vendor was not a riparian owner, and that he had no interest in the stream and its bed, he could have made a better case than he now has, because of the failure of title to the riparian rights. To award the defendant the equivalent of 127 acres outside of the bed of the stream would be to add 127 acres to his riparian rights, including 6 acres of the river bed. In legal effect, he would thereby acquire 133 acres, instead of 127, and would have been liable to the plaintiff at the agreed

price of $152.50 for a total consideration correspondingly larger than that stated in the contract. The trial court, therefore, properly found that the dimensions of the tract conveyed extended to the center line of the stream, and that the defendant received the full 127 acres contracted for.

III. By Count IX of the counterclaim, the defendant claimed a recovery under the covenants of the deed for breach of warranty against incumbrances. It appears from the pleading and the evidence that the contract of sale was entered into in July, 1913. It provided for a settlement and conveyance on March first following. It also provided that payments should be made, prior to such date, amounting to $6,000; that, for the balance of the purchase price, a specified incumbrance of $5,600 should be assumed by the vendee, and a mortgage should be executed for the balance of the purchase price. It appears, also, that, besides the specified incumbrance of $5,600, there were, in fact, two other mortgages, of $1,800 and $1,500, respectively, upon the property. The deed delivered on March 1st warranted against all incumbrances except the specified $5,600. The defendant's claim of breach of warranty relates to the two mortgages of $1,800 and $1,500, which are known in the record as the Kiehn and Cave mortgages. In answer to this count of the counterclaim, the plaintiff pleaded, in effect, that these mortgages had been taken account of in the settlement and had been deducted from the purchase price otherwise due. In proof of this count of his counterclaim, the defendant Hites testified, as a witness, that, at a time subsequent to March 1, 1914, he had paid the two mortgages in question. On the question of whether he had received credit for these mortgages in the settlement, he refrained from committing himself.

On behalf of plaintiff, it appeared, by the testimony of

3. COVENANTS: incumbrances deducted from purchase price.

Soesbe, that he (Soesbe) acted as agent for the vendor in the sale of the land and in the settlement therefor on March 1, 1914. Soesbe was a banker, and the settlement was had in his bank, and under his supervision. On this question the following record appears from appellants' abstract:

"Q. You may state, if you know, whether or not the Cave mortgage and the Kiehn mortgage, referred to, were taken out of the purchase price that Hites had agreed to pay, in settling? (Mr. Mitchell: Object to that as not the best evidence, and for all the reasons heretofore urged in the previous objections.) A. They were reckoned in the set- tlement, and they were taken out. Mr. and Mrs. Hites were to give Compton a mortgage for such portion of the purchase price as was not included in the incumbrances already on the land, and the mortgage that they so executed back to Compton was for the amount of the purchase price, less the cash they had already paid, less the amount of the incumbrance they found on the land which was not as- sumed by them. (Mr. Mitchell: We move to strike all of the answer after the words 'they were taken out,' for the reason that it relates to the intention of the parties, and states a conclusion of the witness merely, and is not compe- tent.)"

Other testimony was given by this witness, in support of plaintiff's prayer for a reformation of the deed as to its covenants so as to include the mortgages in question in the exception. In the decree of the district court, reformation of the deed was granted. The foregoing testimony clearly supported the defense pleaded by the plaintiff to this count of the counterclaim. The defendant Hites, though subse- quently called to the witness stand, was not interrogated as to this testimony. It is undenied in the record. Counsel for appellant meets this testimony by arguing here the validity of the objections which he urged in the lower court, and which are above set forth. So far as the recital of the

contents of the contract by the witness was concerned, it was technically objectionable. The recital, however, was in strict accord with the contract, and was, therefore, non-prejudicial. We are less interested in the technical validity of the objections than we are in the issue of fact tendered by the testimony. The testimony was competent to the fact that, in the March settlement, these two mortgages were taken account of, and were deducted from the amount of the purchase price otherwise due. Indeed, according to the further undenied testimony of Soesbe, this was done at the request of and for the convenience of the defendant himself. Assuming their deduction in the settlement from the amount of the purchase price, such fact was a complete defense to his counterclaim. Whether there should have been a reformation of the deed, is a question not worth while to discuss. It was a good defense, without a reformation of the deed. There was nothing in such fact contradictory to the deed or to its covenants. It was a recognition of the covenants of the deed. By allowing credit on the purchase price for the amount of such mortgages, the plaintiff recognized his obligation to clear the same as an incumbrance. The deduction was the equivalent of paying the amount thereof into the hands of the vendee. While it was not a payment of the mortgages as to the holder thereof, it was a payment thereof as between vendor and vendee. If the undenied testimony of Soesbe needed any corroboration, it is to be found in the figures of the settlement. Under the terms of the contract, the balance of the purchase price due on March 1st, over and above the prior payments agreed to be made, and the $5,600 incumbrance, would be $7,767.50, for which sum the plaintiff would have been entitled to a purchase-money mortgage. The actual balance, however, for which a purchase-money mortgage was given, was $4,467.50. The difference of $3,300 represents the total of the principal sums of the two mortgages in question.

We find further corroboration in the events of the trial. The defendant had rested his main case on his counterclaim, without offering any testimony on this count. Furthermore, he pleaded a tender to the plaintiff for the full amount of the purchase-money mortgage, less the amount claimed in the other counts of his counterclaim for alleged shortage of acreage. The only testimony which the defendant offered in support of this count was that already referred to, which was given on surrebuttal, and after the witness Soesbe had testified. And yet counsel has pressed this claim upon us, as worthy of candid attention. We are clear in the conviction that these mortgages were taken account of in the settlement, and that the defendant received credit therefor on the purchase price, in full compliance with the covenants of his contract and of his deed. The decree of the district court was right, and it is, accordingly,— *Affirmed.*

PRESTON, C. J., LADD and SALINGER, JJ., concur.